FILED

02/12/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

September 26, 2018, Session

**STATE OF TENNESSEE v. JERRY RAY OAKS**

**Appeal from the Criminal Court for Carter County**
**No. 23804     Lisa Rice, Judge**

**No. E2017-02239-CCA-R3-CD**

The defendant, Jerry Ray Oaks, appeals his Carter County Criminal Court jury conviction of vehicular homicide, claiming that the trial court erred by denying his motion to suppress the results of a warrantless blood draw, that the defendant should have been permitted to argue the results of a vehicle inspection during closing argument, and that the evidence is insufficient to support his conviction of vehicular homicide. The trial court erred by finding that exigent circumstances justified the warrantless blood draw. Accordingly, we reverse the defendant's conviction of vehicular homicide and remand the case for a new trial.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Reversed and Vacated; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined. ROBERT L. HOLLOWAY, JR., J., filed a dissenting opinion.

Wesley K. Taylor (at trial and on appeal) and Melanie Sellers (at trial), Assistant District Public Defenders, for the appellant, Jerry Ray Oaks.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Ken C. Baldwin, District Attorney General; and Matthew Roark, and Ryan Curtis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In August, 2017, a Carter County Criminal Court jury convicted the defendant, Jerry Ray Oaks, of one count of vehicular homicide by intoxication arising out of a car crash that occurred on February 13, 2016, in which the victim, Vincient Hitechew, was killed. Prior to trial, the defendant pleaded guilty to one count of driving

on a revoked license. The trial court imposed an effective sentence of 16 years' incarceration.

## I. Facts and Procedural History

### A. Suppression Hearing

Johnson City Medical Center ("JCMC") charge nurse, April Douglas, testified that she was working in the JCMC emergency room on the night of February 13, 2016. At 11:59 p.m. that night, the defendant was brought into the emergency room as a level one trauma patient. Ms. Douglas explained that level one is the most serious level of trauma and is reserved for patients who have been intubated and are unresponsive. Ms. Douglas testified that the defendant's medical records indicated that he had a "lower abdominal wall contusion . . . with obvious deformity to all extremities." Prior to arriving at JCMC, the defendant was intubated and given Ketamine and Rocuronium for sedation. Upon his arrival at JCMC, the defendant was "emergently taken to the [operating room] to control hemorrhage and bowel resection." Ms. Douglas described the defendant's injuries as "serious." Although Ms. Douglas was not personally involved in the defendant's care, she drew his blood at the request of Tennessee Highway Patrol ("THP") officer William Shelton. She explained that there is no set point in the triage process in which to draw the patient's blood and that whether she draws a patient's blood on the request of law enforcement "depends on if the patient is really critical and if we have time to draw that blood." When asked to give an example of a time when she would not be able to obtain a patient's blood sample she stated, "if we're doing CPR on a patient for coding the patient." The defendant received four units of blood while in the emergency room beginning at 12:28 a.m. and was transferred to the operating room at 12:55 a.m.

On questioning by the court, Ms. Douglas testified that she would not be permitted to obtain a blood sample if the patient was "coded." She stated that law enforcement officers are not permitted in the operating room.

On cross-examination, Ms. Douglas reiterated that she was not personally involved in the defendant's care other than to draw his blood; her testimony was based upon the defendant's medical records. She acknowledged that some of the records have discrepancies, such as one form indicating the defendant arrived at JCMC by helicopter and another form indicating he arrived by ambulance. She explained that the sedation medicine that the defendant received was administered prior to his arrival at JCMC. Ms. Douglas agreed that whether law enforcement officers would be permitted in an operating room would be the decision of the operating doctor.

Carter County Sheriff's Department ("CCSD") Lieutenant Keith Range testified that "a little after 11[:00] p.m." on February 13, 2016, he received a call of "a motor vehicle accident with probable injuries, and also, vehicle fire . . . with one entrapped." The 9-1-1 call came in at 11:10 p.m., and CCSD Lieutenant Larry Vaughn[1] was the first officer to arrive on the scene in Carter County at 11:16 p.m. CCSD deputies Michael Malone and Mark McClain also responded to the scene. Lieutenants Range and Vaughn, along with Deputies Malone and McClain were the only four CCSD officers on duty in Carter County at the time, so Lieutenant Range sent Deputy McClain away from the scene so that one officer would be available for other calls. Numerous other emergency responders were on the scene, including the Carter County Volunteer Fire Department, the Elizabethton Fire Department, Central Fire Department, three Emergency Medical Service ("EMS") units, and a coroner. One unit from the Elizabethton Police Department responded to a request to block traffic to the scene. Because the accident blocked the entire road, emergency crews had to park 50 yards away. Lieutenant Range estimated that 12-15 emergency personnel were at the scene.

Lieutenant Range testified that it was his practice to request assistance from the THP in the case of "a serious accident, one that involves death," or one "that's going to need . . . more detail done in the investigation." In this case, he contacted the THP while en route to the scene, although he did not yet know that a criminal investigation would be required. Lieutenant Range said that the CCSD did not conduct a criminal investigation in this case because, once the THP had been notified, the THP took over the investigation, and CCSD officers provided only support such as traffic control.

When he arrived at the scene, Lieutenant Range learned that one person, who appeared to be deceased, was trapped inside a vehicle. He noted that the vehicles at the scene appeared as if they had been "fused together" and that the Jeep was on fire. Lieutenant Range testified that he did not speak to any witnesses or emergency responders at the scene; he instructed Lieutenant Vaughn to secure the scene and have the witnesses wait until the THP arrived, and he sent Deputy Malone to direct traffic. Trooper Brad Proffitt was the first THP officer to arrive at the scene, arriving only a few minutes after Lieutenant Range. Lieutenant Range testified that, according to the 9-1-1 records, the defendant was transported from the scene by ambulance at 11:34 p.m. and arrived at JCMC at 11:57 p.m. He described the scene as "kind of chaotic" because they

---

[1] At the time of the investigation, Lieutenant Vaughn was a Sergeant with the CCSD. We will refer to him by the title of "Lieutenant" as this was his rank at the time of trial.

had to secure witnesses, manage traffic, and "had to direct . . . fire trucks and EMS. So it was -- it was chaotic."

On cross-examination, Lieutenant Range clarified that Deputy Malone arrived on the scene before Deputy McClain, who was on the scene only "for a brief time." The Elizabethton police department officer who responded was "well over a mile away" blocking traffic to the road, but Lieutenant Range noted that the traffic that night was light. He stated that three fire departments and at least three medical units responded to the scene, and the THP's focus was the investigation. He testified that the defendant was transported to JCMC approximately 20 minutes after the first officer arrived on the scene.

On redirect examination, Lieutenant Range testified that other emergency responders do not have a law-enforcement function because they lack the qualifications to assist with search warrants and taking statements.

On recross-examination, Lieutenant Range testified that he had had experience drafting warrants as a narcotics agent, but he had no experience drafting warrants as a patrol officer. He agreed that drafting a warrant was "just a statement of probable cause" that can be based on knowledge from other officers.

Trooper Brad Proffitt testified that he was dispatched to the scene at 11:25 p.m. and arrived at that same time because he was less than a mile away. He described the scene: "[T]he flames were as high as you . . . you could see. It looked like a chaotic situation, numerous fire trucks, EMS on scene." An EMS worker apprised him of the situation and told him "that there was . . . an odor of alcohol, a strong odor of alcohol, on one of the drivers." Trooper Proffitt then "got on the radio and relayed . . . that this might be a possible vehicular homicide." He testified that he notified his supervisor of the possibility of a vehicular homicide "less than ten minutes" after arriving on the scene, and the incident became a criminal investigation sometime "between 11:25 and 11:39 p.m." After notifying his supervisor of the incident, Trooper Proffitt began preserving evidence. He also ensured that CCSD "took care of the safety of . . . others on scene as well as traffic control."

Trooper Proffitt had no contact with the defendant at the scene and did not see when the defendant was taken to the hospital because he "was doing other things." Trooper Proffitt spoke with EMS personnel and witnesses and learned that only two people were involved in the wreck. The witnesses told him that they were able to remove one driver from his vehicle, but they could not see the other driver because of the smoke. These witnesses reported that "they could smell the odor of alcohol at that time."

-4-

Trooper Proffitt testified that THP Sergeant Jason Andes arrived on the scene at 11:39 p.m., and, at that point, Trooper Proffitt's role shifted to preserving evidence and processing the scene. Trooper Proffitt stated that he had experience writing search warrants. He noted, however, that he had written one search warrant for a blood draw, but that was after the incident in this case. Prior to the accident in this case, Trooper Proffitt had never written a warrant for a blood draw. Trooper Proffitt testified that the responsibility to draft a warrant in this case "could have been anyone's" because it was a "chaotic situation." He stated that he did not think about obtaining a warrant in this case; instead, he left the decision about warrants up to Sergeant Andes.

On cross-examination, Trooper Proffitt testified that when he arrived on the scene, the defendant had already been removed from his vehicle and was being treated by EMS. He acknowledged that he did not have to deal with directing traffic or providing life-saving measures; rather, he was able to focus solely on the law-enforcement aspect of the crash. Trooper Edward Tester was at the crash scene as well. At the time, Trooper Proffitt understood that a blood draw would be mandatory because one person was deceased and the other smelled of alcohol. Trooper Proffitt explained that THP troopers receive 40-hours of annual training that includes training on mandatory blood draws. The THP had procedures for obtaining search warrants, but they do not have judges on call to sign warrants. Trooper Proffitt noted that troopers had telephone numbers for prosecutors and "can try to get a hold of them" if needed. He acknowledged that he did not attempt to call any judge or assistant district attorney while investigating the crash but stated that that decision "wasn't up to me, it was up to my supervisor." Trooper Proffitt explained that troopers had search warrant templates available to them, which templates had blanks to fill in information and a space to write in an affidavit. He agreed that warrants may be drafted based on knowledge of other officers. He acknowledged that all troopers had radios and telephones with them the night of the crash. He confirmed that JCMC, where the blood draw was performed, is located in Washington County. Trooper Proffitt stated that he knew that a General Sessions Court judge lived in Washington County. He confirmed that the THP has an office a couple of miles away from JCMC and that the THP specializes in traffic fatalities, but he noted that the THP does not have the ability to send electronic warrants.

On redirect examination, Trooper Proffitt noted that THP Sergeant Robert Johnson arrived at JCMC "[p]robably later on that night sometime." He explained that the one warrant he obtained for a blood draw took "[o]ver an hour" and was signed by a judge in Unicoi County. In that case, he typed and printed the warrant in his cruiser and took it to the judge's house to be signed. He further explained that the THP office on John Exum Parkway is not staffed but rather is "just a building that they go to do paperwork in."

-5-

Upon questioning by the court, Trooper Proffitt explained that THP troopers have the capability to type and print warrants from their cruisers. He speculated that, in this case, it would have taken him "[a] good twenty minutes or so" to complete a search warrant, another "ten minutes or so" to find a Carter County judge to sign it, then 20-25 minutes to take the warrant to the judge, and additional time to take the signed warrant to JCMC, all of which would have taken "over an hour."

During redirect examination, Trooper Proffitt stated that he knew where two Carter County judges lived. He also stated that he had telephone numbers for judges, but he did not attempt to contact any of them during his investigation of this case. He reiterated that, in his opinion, there was not sufficient time to obtain a search warrant in this case because of "the chaotic incident, the time to do the search warrant, the distance from the . . . scene to the judge's house, and the distance from the judge's house to [JCMC]." He stated that he would not have been able to leave the scene of the accident because there was "[j]ust too much going on."

On recross-examination, he testified that he was focused solely on the law enforcement aspect at the scene. He acknowledged that he could not be certain how long it would have taken him to get a warrant in this case because he made no attempt to obtain one. He did not contact a Washington County judge, so he also did not know whether any one of them could have met an officer at JCMC to sign the warrant. He insisted that the decision to pursue a warrant was up to his supervisor and maintained that, in this case, there was not time to get a warrant because of "exigent circumstances."

THP Sergeant Jason Andes testified that, on the night of the accident, he was supervising officers in Washington and Carter Counties. He arrived on the scene at 11:35 p.m. and described it as "a very horrific scene . . . . The scene was pretty chaotic, a lot of personnel, people doing multiple things to include medical." Trooper Proffitt was "working on witnesses" when Sergeant Andes arrived, and CCSD was diverting traffic, which "was a big help." He learned that witnesses had reported that alcohol may have been involved with the driver "that had been transported," later identified as the defendant. He stated that he "quickly knew at [that] point that it was going to turn into possibly a felony case by -- just by looking at the scene just to that -- that incident." Sergeant Andes explained that one of his roles included notifying the Critical Incident Response Team ("CIRT") to brief them on the incident and have them collect evidence from the scene. The CIRT officer notified Sergeant Andes that he would not be able to get to the scene for more than two hours.

Sergeant Andes testified that the defendant had been transported from the scene before Sergeant Andes arrived, but medical personnel informed him that the defendant "was very critical and it would be a miracle if he made it." At that point, Sergeant Andes instructed Trooper Shelton in Washington County to go to JCMC and "try to talk with the defendant" and "to go ahead and get some blood on the defendant." He did not discuss obtaining a search warrant with Trooper Shelton "because [he] knew time was of the essence," and he "made the decision at that time there . . . just wasn't that time." He stated that he knew that the defendant was "very critical" and that "if [the defendant] made it there and once he hit the ER if we weren't there waiting on him . . . there was no chance for us to get any blood." Sergeant Andes estimated that it would have taken 20-30 minutes to draft a warrant and an additional 20-30 minutes to get it signed by a judge, amounting to "an hour at a minimum . . . if everything goes perfect" with additional time to take the warrant from the judge's house to JCMC. He asserted that he had probable cause of the defendant's intoxication because several people on the scene reported that they smelled alcohol on the defendant, and he could have articulated his probable cause to a judge if he had had the time. Sergeant Andes did not know anything of the defendant's condition when he was transported from the scene other than that he was "very critical."

Sergeant Andes stated that he knew generally where two Carter County judges lived but did not have their telephone numbers. He had the addresses for more than one Washington County judge and the telephone numbers for at least one. Sergeant Andes testified that he had no experience obtaining search warrants for blood draws except for those he did in training. He observed another officer's obtaining a blood draw warrant once, and, on that occasion, the process of drafting the warrant, obtaining a judge's signature, and going to the medical center took "well over an hour." In this case, he did not attempt to contact any judge, but he did try to call the district attorney shortly after arriving on the scene but received no answer. He did not call any assistant district attorneys because he did not have their telephone numbers. Despite his lack of experience and despite that he made no attempt to obtain a warrant in this case, Sergeant Andes insisted that it would have taken 20 minutes to draft the warrant, "at least [20] minutes" to get to the house of a Carter County judge to sign the warrant, and another 30 minutes to get to JCMC with the signed warrant. Although he acknowledged that he was capable of typing and printing a warrant from his vehicle, he noted that this equipment had malfunctioned before. He testified that he was not aware of any judge's permitting electronic search warrants. He explained that the reason he did not seek a search warrant in this case was time. He stated that he was trained that "unless there's exigent circumstances you need to try your best to get a search warrant."

-7-

Sergeant Andes testified that when he arrived at the crash scene, CCSD Lieutenant Range briefed him on the situation and remained on the scene for "probably less than ten minutes" before going to direct traffic. In describing his own role at the scene, Sergeant Andes explained that because the other troopers at the scene were "seasoned," "experienced," and knew their roles, he did not "have to tell them what to do"; instead, his role was "to make sure it's done correctly." Because he did not need "to stand over [his officers] and make sure they're picking up every piece of evidence," he contacted the CIRT leader, the CID investigator, and the district attorney general's office while the other troopers collected and preserved evidence. He acknowledged that he could have had an officer try to get a search warrant to draw the defendant's blood, but the defendant "would have already made it to the Med Center and been going back before we could have got anything done," and Sergeant Andes did not "feel like it would have been accomplished."

During cross-examination, Sergeant Andes clarified that he was the second THP officer to arrive after Trooper Proffitt at the crash scene. They focused on "[p]reserving the scene, collecting evidence, . . . [and] talking to witnesses." Evidence preservation included taking photographs, marking the scene, and generally preparing for the CIRT, talking to witnesses, and collecting any tangible evidence from the vehicles. He reiterated that emergency personnel at the crash scene included THP units, several fire departments, and several EMT units. Trooper Shelton was in Washington County for the duration of the investigation. Sergeant Andes again admitted that he did not attempt to contact any judges in this case but knew there were three General Sessions Court judges in Washington County and had been successful in contacting Judge Arnold in Washington County for search warrants in the past. He acknowledged that the THP has fill-in-the-blanks search warrant templates that can be typed up and printed from their vehicles and that the THP officers also have radios and cellular telephones. He agreed that warrants can be based on knowledge obtained from other officers. He did not have any other Washington County judge on his list because he "rel[ies] on the troopers to be able to get a hold of the appropriate judges." He stated that cases with traffic fatalities are the specialty of the THP, and the CCSD contacted THP and requested them to investigate this case.

Trooper William Shelton testified that on the night of the accident, he was dispatched to JCMC to investigate because "alcohol was involved." He testified that he arrived at JCMC at 12:03 a.m., and it took him approximately five to seven minutes after arriving to locate the defendant. Trooper Shelton stated that, when he found the defendant, he "immediately went in" to the hospital room where "[t]here was several medical personnel working on [the defendant]." He noted that "[i]t appeared that [the defendant] was very critical," and "[t]here was a lot of hectic activity going on with the

-8-

ER, and the doctors, and nurses, and things like that." Trooper Shelton notified "the in charge nurse" that this incident involved alcohol and that he "was there to make identification of the . . . person and also to obtain blood possibly." He explained his process of obtaining the defendant's blood sample:

> I kind of stood around for a few minutes, and . . . could tell that they [were] frantically trying to do some things with him. . . . Somebody said that he was trying to be stable enough to take to the operating room. At that point I just kind of shouldered my way in, and . . . said, I -- I'd like to get some blood due to the situation. I understand there's possibly a death involved.

The medical staff "was frantically trying to get [the defendant] stabilized to take him to the [operating room]." Trooper Shelton requested the blood draw at 12:20 a.m., and the defendant's blood was drawn at 12:25 a.m. He testified that he was not instructed to obtain a warrant prior to requesting that the defendant's blood be drawn. He further testified that, in his experience, "getting search warrants . . . [is] very time consuming." He continued, "In a situation like this from my experience, if I lose the person in the emergency room when they take them off to other places in the hospital that's generally [the end] of my contact with them, unless, they bring them back, you know, from x-ray or something." In this case, he "really felt that [the defendant] wasn't going to make it and he wasn't going to live and once I lost contact I felt that was it, my only opportunity to get a sample." He surmised that he had approximately 20-30 minutes to obtain the defendant's blood sample. Trooper Shelton acknowledged that he had successfully obtained two search warrants for blood draws "since [THP has] been doing them." Each of those warrants took "[a]t best two hours, two and a half hours" to obtain, and in each of those cases, he drove to Carter County to have Judge Street sign the warrant. In this case, Trooper Shelton did not attempt to contact a judge, the district attorney general, or any of the assistant district attorneys general.

On cross-examination, Trooper Shelton explained that the Request for Blood Withdrawal form indicated that the blood draw was mandatory, which generally meant that the accident resulted in injury or death, and intoxication was suspected. He understood "mandatory" to mean that a blood sample was to be taken with or without a warrant. He reiterated that he did not attempt to contact any judge during this investigation. He acknowledged that the THP has template warrants that can be accessed from their vehicles and that officers can email documents to each other. He agreed that it was "theoretically possible" for one trooper to type up a search warrant and email it to a trooper in another county to take to a judge to be signed. He also agreed that it was

possible for a trooper to call a judge in Washington County and ask that judge to meet an officer at JCMC to sign a warrant, but that did not happen in this case. He stated that he did not "know where any judge lives" and that he had "never been to any of their homes." He confirmed that the specialty of the THP is "[p]rimarily investigation . . . of crashes." He had received training on obtaining search warrants for blood draws that required him to draft a warrant and have it graded. Trooper Shelton testified that he had the telephone numbers for a few judges in his cellular telephone, but he "usually rel[ied] on . . . dispatch to [provide him] with numbers and such." The Fall Branch District THP troopers do not otherwise have a list with judge's contact information.

Johnson City Police Department ("JCPD") officer Drew Guider testified that he had completed driving under the influence ("DUI") training and had made approximately 60-70 DUI arrests. He explained the JCPD procedures for obtaining a blood draw warrant:

> Upon arrival on the scene . . . [we] go through our investigation on the scene, clear the roadway, do whatever we need to do there, conduct field sobriety tests, establish our probable cause for . . . driving under the influence. At that point [we] take the person into custody and usually we have another officer there that we're able to hand off our defendant, the suspect to, and allow them to watch them and we go to headquarters and transport the suspect to our police headquarters. There we get on the desktop computers there and we have the search warrant forms there. . . . [W]e write out our narrative, our probable cause to our warrant, all that kind of stuff, fill all that out while the other officer[] watches our suspect. When we're close to being finished we start at the top of our judge call list and -- and start calling judges, or -- or pick one that we want to call. Once we get a hold of a judge and find one that will sign the warrant we go and get the warrant signed. Once we get the warrant signed we contact the other officer that has custody of our prisoner and have them meet us at Franklin Woods, or [JCMC]. We meet there with the warrant and at that point we draw the blood.

JCPD has a list of judges for officers to call. Officer Guider estimated that it would take him approximately two hours from the time of a traffic stop to obtain a search warrant. He testified that drafting a warrant and obtaining a judge's signature would take approximately 30 to 45 minutes. Officer Guider testified that he "usually call[ed] Judge

-10-

Arnold" who lives only "three to four minutes away" from JCMC. In his four-and-a-half years with the JCPD, he had always been able to find a judge to sign his warrants. He explained that JCPD officers do not have laptops or printers in their cars.

During cross-examination, Officer Guider testified that he had never needed to obtain a search warrant from Judge Rice or Judge Street, and he did not know where they lived. He estimated that the JCPD had between 15-20 officers available at any time to assist in investigations, and this made it "much easier when you can hand off your prisoners to somebody else." He surmised that Johnson City, as a territory for law enforcement, is smaller than Carter County. He explained that he usually tried to contact Judge Arnold for a warrant because he lived three to four minutes away from JCMC; a second judge lived "a farther distance away," and he did not know where the third judge lived.

Following arguments by both parties, the trial court ruled that exigent circumstances existed excusing the need to obtain a warrant before drawing the defendant's blood. Specifically, the court found that, because it would have taken the officers one-and-a-half to two hours to obtain a warrant in this case and because the officers "knew they had a short period of time before this very critically injured person was going to be taken back to surgery," exigent circumstances justified the warrantless blood draw.

The trial court granted the defendant's motion for an interlocutory appeal of the denial of his motion to suppress the results of the warrantless blood draw. This court denied the defendant's application for permission to appeal holding that "the defendant has failed to establish the necessity of interlocutory review." *State v. Jerry Oaks*, No. E2017-00827-CCA-R9-CD (Tenn. Crim. App., Knoxville, June 6, 2017) (Order).

*B. Trial*

At trial, the victim's wife, Kim Hitechew, testified that on the night of the accident, she and the victim attended a charity dinner, and the victim left the event shortly after 11:00 p.m. to get something he had forgotten. When she could not get in touch with the victim, Mrs. Hitechew contacted the THP, who informed her that there had been an accident. A friend of Mrs. Hitechew's went to the scene to verify that the accident involved the victim. Officers later transported Mrs. Hitechew to the hospital and informed her what had happened. Mrs. Hitechew testified that she had no interaction with law enforcement officers other than their keeping her up to date on the case.

-11-

Lieutenant William Buchanan, an officer with the Avery County Sheriff's Office in Newland, North Carolina, testified that he was traveling home from Johnson City with his family when he came upon the crash scene. He first noticed "what appeared to be some kind of object in the road." As he neared, he realized that object was a vehicle. It was not "until [he] actually got out of [his] car and walked up to the first vehicle that [he realized] it was actually a two vehicle accident." Lieutenant Buchanan testified that this accident occurred in Carter County. He described the night of the accident as "extremely dark," but he noticed "a small puff of smoke coming from what appeared to be a . . . Jeep Commander, or a Jeep Liberty." After retrieving a flash light, he saw that someone was in the driver's seat of the other vehicle. He attempted to find a pulse for that driver, but could not. He then heard a noise from the Jeep and found the defendant "passed out" and "just kind of moaning." He described the defendant as "very addled, didn't know where he was at." Lieutenant Buchanan testified that he had "never actually seen . . . a wreck that -- that bad where it was two cars had -- had become one."

Lieutenant Buchanan testified that "the flames w[ere] starting to come over the hood, or the top of the car." By that time, an EMS worker named Sean was on the scene, and together they attempted to open the defendant's car door. When the car door would not open, they attempted to pull the defendant out of the back of the car, but the fire prevented them from doing so. They then used a tow strap attached to another vehicle to pull the door open on the defendant's vehicle. The defendant's "legs w[ere] stuck under the dash where the car had crumpled in on him," so Lieutenant Buchanan had to "pull[] with all [his] might" to remove the defendant from the vehicle. After moving the defendant away from the burning vehicles, Lieutenant Buchanan "held him in traction" while an EMT began medical care. Lieutenant Buchanan noted that the defendant "never even realized that he was in a wreck at that time." Lieutenant Buchanan was not able to remove the victim from his vehicle because "there was a very small hole where the window used to be, but it had crumpled so bad that you could just barely stick your hand in there to . . . feel around to see if somebody was in the car."

Lieutenant Buchanan testified that he was at the crash scene for approximately 10-15 minutes before emergency responders arrived. He did not provide additional assistance after law enforcement and other emergency responders arrived on the scene. He explained that the fire in this case "was in the motor housing" and "started somewhere near the fuel line." He saw "just a little bitty puff of smoke," but water was unavailable to put the fire out because "it was the dead middle of winter, everything was froze[n]." The fire grew from a "puff of smoke" to "flames [that were] probably even forty, fifty foot above the car." When he and Sean pulled the defendant from his vehicle,

the defendant's pants and shoelaces were on fire "but nothing else." He speculated that "the fire was so extreme" because there were "two vehicles with both full of gas."

Lieutenant Vaughn testified that he arrived on the scene "probably within five minutes of the initial call." He described the vehicles at the crash scene as "in opposing directions, but they were . . . pretty well mated in the right-hand lane that would have been leaving Elizabethton." He first saw "a white male in the driver's seat of a black sedan" and "started calling out to them." Lieutenant Vaughn was unable to find a pulse on that driver and moved to the other side of the vehicle. He saw "several people off in the ditch line . . . with the driver of the SUV," later identified as the defendant. It was unclear whether there were additional passengers in either vehicle, so he "went back to the vehicles to try to see if [he] could see anyone else." Deputy Malone arrived on the scene, and together they attempted to remove the driver from the black sedan. They were unable to move the victim because he "couldn't get the doors open" and "the dash was impacted around him." He testified that he believed the victim to be deceased because he was unable to find a pulse, "saw no signs of breathing," and the victim did not respond to verbal or physical stimuli.

Lieutenant Vaughn recalled that while he tried to figure out a way to remove the victim from his vehicle, "the fire had spread into the engine compartment and we had -- I mean for safety reasons we had to back off. Things were starting to cook and pop off." The vehicles became "fully engulfed" by the fire. After Lieutenant Range arrived, Lieutenant Vaughn's role became one "simply for support purposes; any traffic control needed; if they had any questions; if they needed [him] to do anything for them; answer -- run interference with people who were showing up on scene." He also aided the THP by contacting the victim's spouse and taking her to the hospital.

On cross-examination, Lieutenant Vaughn agreed that the road where the accident occurred was very dark and did not have any street lights or other lighting.

During redirect examination, Lieutenant Vaughn explained that the area where the accident occurred was in "a very rural section of the county," "there's no residence that's close that would [provide] . . . any ambient light from a street light or anything like that." That particular stretch of road is "a long straightway. It's got a general slope. . . . [T]here's nothing extreme about that stretch of road. It's just a . . . long stretch of highway." He noted that there are some hills and "the road does bounce up and down kind of like a roller coaster in places, but . . . it's not extreme dips[,] it's just a rolling highway."

The night of the accident, four CCSD officers, including Lieutenant Range, were working. Lieutenant Range explained that Carter County had three zones with an officer assigned to each zone and the shift commander overseeing all three zones. When a 9-1-1 call came in, the dispatcher notified the officer in the appropriate zone, and if the call required additional responders, Lieutenant Range would respond or assign another officer to respond. The night of the accident, a 9-1-1 call came in at 11:10 p.m., and Lieutenant Vaughn arrived on the scene at 11:16 p.m. Lieutenant Range testified that, although the CAD notes[2] indicated he arrived on the scene at 11:16 p.m., he actually arrived 12-15 minutes after Lieutenant Vaughn. When he arrived on the scene, he "saw two vehicles front end to front end on fire" and both vehicles were positioned "in the southbound lane."

Lieutenant Range testified that, in this case, Lieutenant Vaughn assessed the scene and told him over the telephone "what we had." Lieutenant Range decided to call the THP for assistance before he arrived at the crash scene because the CCSD "are not reconstructionists. We do not have the extensive training in working motor vehicle accidents that the [THP] has. And when we've got something that serious in nature also being on a state highway . . . it would be best if [THP] investigated the crash."

Lieutenant Range testified that Lieutenant Vaughn and Deputy Malone were at the scene when he arrived, and Deputy Malone had already blocked the road south of the accident. Lieutenant Range managed traffic on "the north end to allow emergency vehicles, fire trucks and ambulances . . . to arrive on the scene." After blocking off the road, Lieutenant Range left the scene and directed Lieutenant Vaughn and Deputy Malone to remain at the scene to assist the THP as needed. Lieutenant Range reviewed the 9-1-1 records and explained that the West Carter County Fire Department arrived at the scene at 11:22 p.m., and the Elizabethton Fire Department arrived at 11:40 p.m. Lieutenant Range never made contact with the defendant and did not "know anything about his medical treatment."

Trooper Proffitt testified that fire crews and EMS were already on the scene before he arrived. He saw emergency medical personnel treating a person, later identified as the defendant, "off to the side of the shoulder of the road," so Trooper Proffitt "let them do their job . . . [and didn't] get in the way of that." He spoke with one of the emergency responders but did not make contact with the defendant. He explained that, in this case, the fire "was the main focus," but it was being handled by the fire

---

[2]     Although none of the witnesses explained what CAD stood for, Lieutenant Range described it as "the CAD notes from the 911 system," and the exhibit appears to be a log of all activity of emergency responders, other than the THP, dispatched in this case.

crews. The "other focus, of course, was traffic, which the sheriff's department was taking care of."

Trooper Proffitt testified that, after learning from other emergency responders that one person was deceased and that emergency personnel smelled alcohol, he notified his dispatcher that this crash was a potential vehicular homicide case. Trooper Proffitt explained that in such cases, a supervisor dispatched to the scene "makes the call from there as far as the investigation goes. We mark the scene, take pictures, and then an attempt is made to get a blood sample, and that process." Sergeant Andes, the supervisor for this accident, arrived on the scene 15-20 minutes after Trooper Proffitt notified dispatch of the potential vehicular homicide. After Sergeant Andes arrived, Trooper Proffitt took on a supporting role, in which he "help[ed] take pictures, mark[ed] the scene, and protect[ed] the scene, protect[ed] the evidence." Trooper Proffitt remained there for four hours. He estimated that it took 45 minutes for the fire crews to extinguish the fire.

During cross-examination, Trooper Proffitt testified that he was the first THP officer on the scene, and when he arrived, the defendant was lying on the shoulder of the road. He did not speak with the defendant because EMTs were working on him. He did not observe any alcohol containers in the defendant's car. There was no indication that the defendant was driving in excess of the 50 miles-per-hour speed limit. Trooper Proffitt explained field sobriety tests, but noted that he could not give these tests to the defendant. He agreed that there were no witnesses to this accident and that he could not "rule out the possibility of there being . . . an obstruction in the roadway." He acknowledged that "possibly" some of the photos of the scene showed snow on the side of the roadway.

On redirect examination, Trooper Proffitt clarified that he could not give the defendant any field sobriety tests because the defendant was incapacitated. He testified that he did not notice the road being slick or having any patches of ice the night of the accident.

Trooper Tester, who had previously worked as a CIRT crash reconstructionist, testified that he was a patrol officer in Washington County the night of the crash. He arrived on the scene at 11:39 p.m. He saw vehicles on fire and that "[t]he fire departments were there. The EMS were there . . . . The sheriff's department was there." He helped Trooper Proffitt "mark the scene," including "marking the vehicles where they were at, taking photographs, and basically, that's about it." He explained that "marking a scene" also entailed looking for "gouge marks, scrap marks," and marking vehicle and tire locations. The CIRT used this information to "recreate the scene."

-15-

Trooper Tester described several photographs of the crash scene indicating gouge and scratch marks and the position of vehicles after the crash. He testified that this crash was notable because "[i]t was a true head-on crash and both vehicles were in the same lane of travel, and -- and the fire of course." He testified that there was no indication at the scene that either vehicle made any attempt to avoid the crash. He explained that if either vehicle had attempted to avoid the other, "you'd have an off-angle hit, or different positioning in the roadway." He pointed out that the gouge and scratch marks indicating the point of impact were in the victim's lane, and the vehicles came to rest in the victim's lane. He agreed that the scene was "kind of a mess." The two vehicles "were together," and "[i]t took two wreckers [to] pull[] them apart."

On cross-examination, Trooper Tester confirmed that he did not see any evidence of braking, such as skid marks, at the scene. He described the location of the accident as a straight part of the road at "a hillcrest." He explained that CIRT analyzes the vehicles after a crash and does "a full 360 degree measurement of the vehicle and put them back to scale" to check for vehicle malfunction.

On redirect examination, Trooper Tester clarified that the crash occurred "right on top of the hillcrest." He described the view from the victim's direction ascending the hill as "blind till you get to the top" and explained that a driver traveling in the same direction as the victim would not have been able to see a car traveling on the other side of the hill.

On recross-examination, Trooper Tester agreed that the defendant also would not have been able to see an oncoming car from his side of the hill. He testified that there were no brake marks or skid marks from the victim's direction.

Sergeant Andes testified that he was a supervisor the night of this incident and received a call of "a crash with injuries and possible fire." He testified that, in this type of incident, he relied "on the troopers, the first officers, the troopers on the scene to relay the information to [him]," from which information he then discerns whether the incident will become a felony investigation, in which case, he "would need to notify the district attorney's office" and CIRT. Before Sergeant Andes arrived at the scene, Trooper Proffitt advised him that he "had a confirmed fatality and there may be alcohol involved." After Sergeant Andes arrived, Trooper Proffitt informed him that witnesses had reported smelling alcohol on the defendant. Based on this information, Sergeant Andes "believe[d he] had to start an investigation." Sergeant Andes testified that he attempted to call General Clark at the district attorney's office, but General Clark did not answer immediately and did not return his call until "sometime later." He explained that he contacted the district attorney's office to "see if they can offer any assistance, any

-16-

advice certainly." The defendant had already been transported to the hospital when Sergeant Andes arrived at the scene, so he wanted to discuss with the District Attorney "[t]he lack of time to obtain a search warrant for the defendant's blood due to him being transported to the hospital."

Sergeant Andes testified that he arrived at the crash scene "around midnight." He explained that his role as supervisor is "to ensure the steps and the process of the investigation [are] being completed thoroughly" and "to ensure that the proper steps are being taken and the guidelines are being met for a proper investigation." As part of these duties, Sergeant Andes directed Trooper Shelton to go to JCMC to obtain a blood sample from the defendant "due to time . . . and the condition of the defendant." Sergeant Andes "looked at the scene," but he "didn't physically look in cars, or anything. [He] just observed the crash on the roadway." He noted that this crash stood out to him because of how "perfectly head-on in one lane of travel" the cars were positioned in the victim's lane of travel. He described the stretch of road where the accident occurred as "very dark at night" and "a pretty long straightaway with a hillcrest" that limits sight on the road.

Trooper Shelton testified that he obtained a blood sample from the defendant. He testified that while Trooper Proffitt and Sergeant Andes "were en route [he] was advised to go to the hospital and receive the sample of blood from one of the drivers." He arrived at JCMC "right before midnight." He observed that the medical personnel "were hurriedly performing life saving measures. There were a lot of people getting a trauma room ready, a lot of medical staff was running around. It was kind of a chaotic scene to be honest with you." He stated that such a chaotic environment for a blood draw is "[s]omewhat" a-typical, but "[i]t has occurred in the past a few times." Trooper Shelton testified that he was trained to "try to get a blood sample as soon as possible," but this can be difficult "when it's a critical situation . . . like this one" because the medical staff is occupied with medical treatment.

To obtain a sample of the defendant's blood, Trooper Shelton "mentioned it to a couple of the medical staff . . . that was working on [the defendant]" who told him they would "get to [him] shortly." Trooper Shelton testified, "After several minutes when I realized that they were -- appeared to be stabilizing him, or taking him to another part of the hospital I just kind of got in their way and said, I need some blood and handed some tubes to them." He explained that THP officers carry a blood toxicology kit with tubes to obtain blood samples for analysis, and he used this kit to obtain the defendant's blood. He filled out a copy of the blood sample request form and gave it and the tubes to one of the nurses. According to the blood sample request form, the defendant's blood was drawn at 12:20 a.m. Trooper Shelton stated that he witnessed the defendant's blood

-17-

draw from "a foot or two" away and described the defendant as "appear[ing] very critical," and he "felt it was life threatening. [The defendant] was unconscious, not alert, . . . unable to talk or anything."

Sean Ochsenbein testified that he was "a resident at Wake Forest in Emergency Medicine" and was previously an EMT with the Putnam County Ambulance Service. On the night of the crash at issue in this case, Mr. Ochsenbein was driving with his fiancée and "arrived upon a motor vehicle accident." He stated that he "saw that two vehicles had had a head-on collision that was quite severe." He "realized that there was fire dripping from one of the vehicles" and he "knew that [there] wasn't a lot of time, so, something needed to occur quickly." An off-duty sheriff's deputy was also at the scene and was calling 9-1-1. Mr. Ochsenbein, who had also been "a vehicle extrication instructor for Tennessee EMS," approached one of the vehicles and determined that the person inside was deceased because he "had no pulse" and because "there was extensive entrapment on the car." He approached the second vehicle and found a person, later identified as the defendant, coming "in and out of consciousness." Mr. Ochsenbein and the off-duty deputy attempted to pull the defendant out of the vehicle through the window, but were "unsuccessful due to the entrapment and the wreck scene." Mr. Ochsenbein attempted to remove the defendant "from the rear" of the vehicle, but the smoke from the fire made it impossible. Mr. Ochsenbein tied a tow strap between his vehicle and the defendant's driver's side door and was able to pull the door partially off of the defendant's car. He cut the defendant out of the seatbelt and "pulled [him] down onto the ground, but [the defendant's] legs were still entrapped under the dash of the vehicle. Mr. Ochsenbein and the off-duty deputy pulled the defendant free from the vehicle, and Mr. Ochsenbein immediately began administering medical treatment. After EMS providers arrived, they took over the defendant's care.

Tennessee Bureau of Investigation ("TBI") Special Agent Jonathan Thompson, a forensic scientist in the toxicology unit of the TBI who was certified as an expert in toxicology and blood analysis, testified that he performed blood alcohol testing on the defendant's blood, and the test results showed the blood sample was "0.225 gram percent alcohol." The defendant's blood sample was not subjected to further testing for the presence of drugs. Special Agent Thompson explained that a blood alcohol level of .08 was "pretty significant" because alcohol "is a central nervous system depressant . . . . [and] can cause an individual to feel drowsy, slurred speech, loss of coordination, loss of muscle function."

April Douglas testified that trauma patients brought into JCMC emergency room are coded by level. Level one refers to the most serious trauma patients who are "unresponsive" and "intubated." According to the defendant's medical records, he was

treated as a level one trauma patient. Ms. Douglas explained that when a law enforcement officer requests a blood sample, her ability to perform the blood draw "depends on if we have a minute . . . , on how serious the patient is." Ms. Douglas assisted the THP in drawing the defendant's blood in this case.

On cross-examination, Ms. Douglas agreed that the defendant "was seriously injured" when he arrived at the emergency room.

Doctor Martina Schmidt was certified as an expert in forensic pathology. Doctor Schmidt testified that she reviewed, but did not perform, the victim's autopsy in this case. Doctor Schmidt explained the autopsy process, including an external and internal examination of the body and toxicology. Doctor Schmidt reviewed the victim's autopsy report and testified that the victim's pathologic diagnoses included multiple blunt force trauma and thermal injury. She explained that blunt force trauma can include "gunshot wound injuries, or sharp force injuries." The victim's cause of death was multiple blunt force trauma. The victim's toxicology report revealed the presence of "Ethanol . . . , Alprazolam, Oxycodone, Phenfermine, Diphenbydramine, [and] Fluoxetine." No carbon monoxide was present, which, Doctor Schmidt explained, indicates the victim was "deceased at the time of the fire." The victim's blood alcohol content "was .256 grams percent." The drugs revealed in the victim's toxicology report included an anti-anxiety sedative, two opiates, an appetite suppressant, an antihistamine-sedative, and an anti-depressant.

On cross-examination, Doctor Schmidt testified that the autopsy report indicated that the victim's "manner of death is accident" and "[t]he thermal injury occurred postmortem." The report also indicated that the victim had been drinking at a dinner party before driving himself the night of the crash. Doctor Schmidt explained that the victim's blood alcohol content was .256, which was more than three times the legal limit of .08. She confirmed that the level of Oxycodone noted on the victim's toxicology report was "in the toxic to potentially lethal range." Doctor Schmidt agreed that the amount of alcohol in the victim's blood would have rendered him under the influence at the time of the crash.

During redirect examination, Doctor Schmidt explained the difference between "cause of death" and "manner of death," explaining that "[t]he cause of death is the immediate cause, what made the person stop breathing . . . . Manner of death is the mechanism for why it occurred." The manner of death is determined by "the circumstances surrounding the death." In vehicular homicide cases, the manner of death is classified as an accident unless the circumstances indicate that the other person "intentionally hit [the victim], or intentionally r[a]n them off the road." Doctor Schmidt

-19-

added that the manner of death listed on the victim's autopsy report was "the medical examiner['s] representation" and not a legal conclusion. She explained that the amount of drugs in a person's system can be categorized as sub-therapeutic, therapeutic, super-therapeutic, toxic, and lethal. She further explained that a person can develop a tolerance for drugs, such as Oxycodone or Hydrocodone, which could affect whether a dosage is toxic or lethal to that person.

On recross-examination, Doctor Schmidt reiterated that she did not perform the victim's autopsy in this case and did not know how long he may have been taking any of the drugs found in his system.

Doctor Kenneth Ferslew testified that he was a full professor of pharmacology at the Quillen College of Medicine and the director of the William L. Jenkins Forensic Center. He stated that, as a toxicologist, he looks at three factors in DUI cases: (1) whether there is evidence of mis-operation of the vehicle; (2) whether there is evidence of the driver's psycho-motor impairment; and (3) whether the driver's toxicology report indicates the presence of drugs or alcohol in the blood. Doctor Ferslew testified that the defendant's blood alcohol concentration was 0.225 gram percent. Calculating an average of .022 during the 80 minutes that elapsed between the crash and the blood draw, Doctor Ferslew estimated the defendant's "blood alcohol at the time of the crash would have been a .247." Based on the defendant's body weight, he determined that the defendant consumed "between 4.65 and 5.11 ounces of ethanol" prior to the crash. The defendant's blood alcohol concentration was "two and a half, almost three times over" the .08 limit in Tennessee. Doctor Ferslew described the effects of such a high level of blood alcohol as including "loss of inhibition," "change in cognition[] or ability to concentrate," "loss of eye/hand coordination," "delayed reaction time," "inability to focus," and "psycho-motor impairment." Doctor Ferslew concluded that the amount of alcohol in the defendant's system at the time of the crash "would have been sufficient to impair his ability, or psychomotor capabilities and contributed to his mis-operation of the vehicle."

Doctor Ferslew testified that the victim had a blood alcohol concentration of 0.256 and was still absorbing alcohol at the time of the crash. The victim's blood was negative for carbon monoxide indicating that "he died in the crash and was not breathing when the fire occurred." Additional tests revealed that the victim had also ingested Alprazolam, two opiates, Phentermine, Diphenhydramine, and Fluoxetine. Doctor Ferslew explained that the victim had "therapeutic concentrations of the opiates . . . [and] a therapeutic and toxic concentration of the Alprazolam." The victim "would have been under the influence of multiple opiates and other CNS depressants, and those can produce an additive to synergistic effect on him. In other words it can be more impairing because

he's combined drugs of multiple mechanisms to CNS depression." Doctor Ferslew clarified that "[i]t is not the toxicologist's position to say what the significance of these effects are on [the] autopsy. That is a call of the medical examiner, or the forensic pathologist." Doctor Ferslew described the drug ranges as, (1) "[s]ub-therapeutic, you haven't taken enough drug to produce a response"; (2) "[t]herapeutic, you have taken it and it has . . . achieved a blood range that gets the desired response"; (3) "[t]oxic, . . . you're getting an adverse effect"; and (4) lethal. He explained that "in certain ranges everyone is going to have an [e]ffect versus no drug being present," but "[t]he extent of that effect could be highly variable" in part based on a person's tolerance of the substance.

During cross-examination, Doctor Ferslew agreed that the defendant was eliminating alcohol from his system, but the victim was absorbing alcohol at the time of the accident. He acknowledged that the Oxycodone in the victim's system was in the "toxic to potentially lethal range." He explained that this level of opiate combined with other drugs would cause "a delay in consciousness," "an altered reaction time," and "a loss of cognition." The additive effects of the victim's high blood alcohol level with the drugs would have caused "sedation," "loss of cognition," "delayed reaction time," "eye/hand coordination problems," "generalized psychomotor impairment, or a combination of cognition to motor function." Doctor Ferslew concluded that the victim's alcohol and drug levels would have impaired his ability to operate his vehicle.

On redirect examination, Doctor Ferslew agreed that the victim and the defendant would have exhibited similar symptoms resulting from their blood alcohol levels. Doctor Ferslew noted, however, that he had no indication that the victim mis-operated his vehicle and "no evaluation of his psychomotor capabilities" because he died at the scene. Therefore, he could not attest to the level of the victim's impairment.

THP CIRT Officer Michael Heatherly, who was certified as an expert in accident reconstruction, investigated the crash scene in the present case. Another officer at the scene with CIRT training "mark[ed] and photograph[ed] the scene," and Officer Heatherly went to the scene the following day. In beginning his analysis, he met with "the investigating trooper and the on scene supervisor; g[o]t a rundown of what . . . was collected, . . . what happened on the scene, what all they did, [and] what needed to be done." The CIRT team then took photographs and surveyed the scene. The vehicles were no longer at the scene when Officer Heatherly did his analysis, but he did examine the vehicles at the wrecker lot.

Officer Heatherly described several photographs, noting that "the Jeep Commander was traveling north and the Lexus was traveling south, and the crash

happened entirely within the southbound lane." He identified the point of impact and the final resting place of the vehicles in the photographs. He stated that this "was just an odd crash" because neither vehicle rotated after impact and "you can follow the path clearly from where they impacted to where they final rest." Officer Heatherly explained that gouge and scratch marks in the road can indicate "either driver input, some sort of mechanical failure, [or] something happened to cause that vehicle to come over into that lane." Based on the gouge and scratch marks, Officer Heatherly determined that the vehicles traveled 71 feet after impact, which was not unusual for the weight difference of the two vehicles. Officer Heatherly testified that there was no evidence at the scene to indicate that the victim was intoxicated. He also found no evidence that the victim or the defendant braked before impact.

Officer Heatherly testified that he conducted an examination of both vehicles on the day following the crash, checking "for any kind of mechanical failure[]" and to "see if there's any evidence of a seatbelt being worn, . . . [or] airbag deployment. . . . We just look at a little bit of everything for the vehicle mechanically and interior." He stated that the "extensive amount of fire damage" made the examination of these two vehicles difficult, but he did not find any evidence of a mechanical failure. He testified that he could not determine how fast the vehicles were traveling or whether either vehicle had its bright headlights on at the time of the crash.

On cross-examination, Officer Heatherly agreed that the photographs he took at the crash scene were taken in the daylight, but the accident occurred at night. He acknowledged that there were no street lights on the part of the road where the accident occurred. He stated that he did not attempt to speak with the defendant. In conducting the vehicle inspections, Officer Heatherly examined the tires, suspension, and lights on the vehicles. He used the general vehicle inspection form in completing the vehicle examinations and exhibited these forms for both vehicles to his testimony. Officer Heatherly reiterated that he did not believe speed was a factor in this crash.

On redirect examination, Officer Heatherly testified that "the damage profile we did on [the Lexus] . . . was so extensively destroyed by fire we just did a perimeter of it. . . . [Y]ou can't really see the damage profile on the front like you can on the other vehicle." He did not believe that the removal of the vehicles from the crash scene impacted the examination of the vehicles.

The defendant moved for a judgment of acquittal on the ground of insufficient evidence, which motion the trial court denied. After a *Momon* colloquy, the defendant waived his right to testify and presented no evidence.

During defendant's closing argument, the State objected to his arguing facts not in evidence. The following exchange was had:

> MR. TAYLOR: . . . Some of the vehicle examination reports were admitted in evidence, and you'll be able to take these back there with you to the jury room and look at them. The first one I would mention, and again you guys can take this back there and look. Trooper Heatherly in his examination of the vehicles he examines the front lights and the rear lights. The options that he had to mark on here, in use at the time of crash; not in use; damaged/missing. Well, on Mr. Oaks Jeep damaged/missing is marked for the front lights. Damaged/missing is marked for the rear lights. Look at his examination of Mr. Hitechew's Lexus, front lights, damaged/missing; rear lights does he mark damaged/missing? No. He marks not in use at the time of the crash, not in use. We know that with most cars you turn on the headlights the rear lights come on. You turn them off, the rear lights go off.

> GENERAL ROARK: Judge, I'm going to object. This is arguing facts not in evidence.

> MR. TAYLOR: It was admitted as an exhibit, Your Honor.

> GENERAL ROARK: Well, making inferences that things turn on or turn off I just . . .

> THE COURT: That particular area of questioning was not explored. There was no testimony that I recall from the Trooper about whether those lights were operable, but that the vehicle was damaged to the extent that it could not be evaluated, so I'll sustain that objection.

> MR. TAYLOR: Your Honor, if I could just briefly be heard on it. He said that the front -- there was front end damage, but he couldn't tell anything about the back. Well, he authored this report and it's been admitted as an exhibit without objection from the [S]tate and it says unequivocally

-23-

that the rear lights were not in use at the time of the accident. And I think the jury should know that.

GENERAL ROARK: Well, Judge, we don't know if those were brake lights. We don't know if those were running lights. We don't know if those are back-up lights. It's just lights. It's just a check box, Judge.

THE COURT: That[] specific small area was not explored. I'll sustain the objection.

The jury found the defendant guilty of vehicular homicide by intoxication, and the trial court imposed an effective sentence of 16 years' incarceration.

In his timely motion for a new trial, the defendant argued that the trial court erred by finding exigent circumstances and admitting the results of his warrantless blood draw; that the trial court erred by sustaining the State's objection during the defendant's closing argument; and that the evidence was insufficient to support the guilty verdict. The court denied the defendant's motion.

In this timely appeal, the defendant reasserts that the trial court erred by finding exigent circumstances to justify the warrantless blood draw; that the trial court erred by sustaining the State's objection raised during the defendant's closing argument; and that the jury's guilty verdict is not supported by sufficient evidence. The State contends that the trial court did not err and that the evidence was sufficient to sustain the guilty verdict.

*II. Motion to Suppress*

When reviewing a trial court's findings of fact and conclusions of law on a motion to suppress evidence, we are guided by the standard of review set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. When the trial court does not set forth its findings of fact upon the record of the proceedings, however, the appellate court must decide where the preponderance of the evidence lies. *Fields v. State*, 40 S.W.3d 450, 457 n. 5 (Tenn. 2001). As in all cases on appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). We review the trial court's conclusions of law

under a de novo standard without according any presumption of correctness to those conclusions. *See, e.g.*, *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999).

Both the state and federal constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (alteration in original) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997). "The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.'" *Coolidge*, 403 U.S. at 455 (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958), and *McDonald v. United States*, 335 U.S. 451, 456 (1948)). "We are not dealing with formalities. The presence of a search warrant serves a high function." *McDonald*, 335 U.S. at 455. Thus, a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure. *See, e.g.*, *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) ("Our cases have held that a warrantless search of the person is reasonable only if it falls within a recognized exception.").

The drawing of the defendant's blood most certainly constituted a search for purposes of the fourth amendment. "Such an invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy.'" *McNeely*, 569 U.S. at 148 (quoting *Winston v. Lee*, 470 U.S. 753, 760 (1985)); *see also Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 616 (1989) ("We have long recognized that a 'compelled intrusio[n] into the body for blood to be analyzed for alcohol content' must be deemed a Fourth Amendment search." (quoting *Schmerber v. California*, 384 U.S. 757, 767-68 (1966) (alteration in *Schmerber*))). Accordingly, we must determine whether the taking of the defendant's blood without a warrant was justified by an exception to the warrant requirement.

The generally recognized exceptions to the Fourth Amendment warrant requirement include "search incident to arrest, plain view, stop and frisk, hot pursuit, search under exigent circumstances, and . . . consent to search." *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005) (citations omitted). The State argues that exigent circumstances existed to justify the warrantless blood draw in this case.

"To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, this Court looks to the totality of circumstances." *McNeely*, 569 U.S. at 149 (citing *Brigham City v. Stuart*, 547 U.S. 398, 406 (2006); *Illinois v. McArthur*, 531 U.S. 326, 331 (2001); *Richards v. Wisconsin*, 520 U.S. 385, 391-96 (1997); *Cupp v. Murphy*, 412 U.S. 291, 296 (1973)). The Supreme Court explained:

> We apply this "finely tuned approach" to Fourth Amendment reasonableness in this context because the police action at issue lacks "the traditional justification that . . . a warrant . . . provides." *Atwater v. Lago Vista*, 532 U.S. 318, 347 n.16 (2001). Absent that established justification, "the fact-specific nature of the reasonableness inquiry," *Ohio v. Robinette*, 519 U.S. 33, 39 (1996), demands that we evaluate each case of alleged exigency based "on its own facts and circumstances." *Go–Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931).

*McNeely*, 569 U.S. at 149-50.

Prior to the ruling in *McNeely*, many courts, including this one, had concluded that the natural dissipation of alcohol in the blood over time created exigent circumstances in every case "involving intoxicated motorists." *State v. Michael A. Janosky*, No. M1999-02574-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Nashville, Sept. 29, 2000). In *McNeely*, however, the Supreme Court, considering the question "whether the natural metabolization of alcohol in the bloodstream presents a per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases," concluded "that it does not" and held "consistent with general Fourth Amendment principles, that exigency in this context must be determined case by case based on the totality of the circumstances." *McNeely*, 569 U.S. at 145. The Court ruled,

> In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be

drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so. *See McDonald*, 335 U.S. at 456 ("We cannot . . . excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative[.]").

*McNeely*, 569 U.S. at 152-53. The Court observed that "[w]hile the desire for a bright-line rule is understandable, the Fourth Amendment will not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake." *Id.* at 158. The Court recognized "the general importance of the government's interest in this area" but concluded that the government's interest did "not justify departing from the warrant requirement without showing exigent circumstances that make securing a warrant impractical in a particular case." *Id.* at 160. The Court acknowledged that the natural dissipation of alcohol over time could be included as a factor in the examination of the totality of the circumstances. *See id.* at 165 ("It suffices to say that the metabolization of alcohol in the bloodstream and the ensuing loss of evidence are among the factors that must be considered in deciding whether a warrant is required.").

In determining whether an exigency existed to justify a warrantless search, our supreme court explained,

[T]he inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant. The exigency of the circumstances is evaluated based upon the totality of the circumstances *known to the governmental actor at the time of the entry*. Mere speculation is inadequate; rather, the State must rely upon specific and articulable facts and the reasonable inferences drawn from them. The circumstances are viewed from an objective perspective; the governmental actor's subjective intent is irrelevant.

*State v. Meeks*, 262 S.W.3d 710, 723 (Tenn. 2008) (footnotes omitted) (emphasis added).

In this case, Trooper Proffitt developed probable cause of the defendant's intoxication within only a few minutes of his 11:25 p.m. arrival on the scene. He immediately notified his supervisor, Sergeant Andes, who arrived on the scene at 11:39 p.m. The defendant was transported from the scene sometime after Trooper Proffitt's

arrival but before Sergeant Andes' arrival on the scene. The defendant did not enter the operating room until 12:55 a.m., an hour and a half after Trooper Proffitt arrived at the crash site and 52 minutes after Trooper Shelton arrived at the hospital. Testimony established that a Washington County General Sessions Court judge lived within a four-minute drive from the hospital. Perhaps that judge may have been unavailable, but such is unknowable because no effort was made to contact him or her. Without an effort to seek a warrant, we cannot conclude that obtaining a warrant would have been impractical.

The record indicates that multiple fire departments, EMS units, the CCSD, and a coroner were present on the scene in addition to three THP officers. The THP officers at the scene worked solely on the criminal investigation while Sergeant Andes performed a supervisory role. The seriousness of the crash and the fact that it involved a fire and a fatality did not, standing alone, create an exigency because the evidence established that the officers at the scene spent their time processing the scene, preserving evidence, and interviewing witnesses; they had no responsibilities involving the fire, emergency medical care, or traffic control.

Although each trooper testified that there was insufficient time to secure a warrant before the defendant was taken into surgery, each also testified that he had no experience obtaining a blood draw warrant prior to this case. Therefore, the officers' testimony regarding the amount of time it would have taken to secure a warrant during this case is mere speculation and not based on articulable facts. Trooper Proffitt's estimation of the time needed to obtain a warrant was premised on the distance to the homes of two Carter County judges, but his testimony did not account for the availability or distance of any Washington County magistrate. The evidence overwhelmingly established that no officer made any attempt to obtain a warrant or contact any magistrate to inquire about his or her availability to sign a warrant. In this case, because the defendant was located in Washington County, a magistrate with jurisdiction in Washington County would have had to sign the warrant. *See* Tenn. R. Crim. P. 41(a) ("A magistrate with jurisdiction in the county where the property sought is located may issue a search warrant authorized by this rule.").[3] That THP officers may not have the contact

---

[3] Because Carter and Washington counties are in the same judicial district, a circuit court or criminal court judge located in Carter County would have jurisdiction to issue a warrant to conduct a search throughout the judicial district, including Washington County. *See State v. Frazier*, 558 S.W.3d 145, 146 (Tenn. 2018) (concluding that "the geographical jurisdiction of a circuit court judge [is confined] to the judge's statutorily defined and assigned judicial district"); *see also* T.C.A. 16-2-506(1)(A) ("The first judicial district consists of the counties of Carter, Johnson, Unicoi and Washington."). However, the signature of a circuit court or criminal court judge is not necessary, and a magistrate in Washington County would also have had jurisdiction to issue a warrant for the drawing of

information readily available for all judges in certain counties is not a factor contributing to exigent circumstances. *See State v. James K. Gardner*, No. E2014-00310-CCA-R3-CD, slip op. at 11 (Tenn. Crim. App., Knoxville, Nov. 12, 2014) (stating that "the lack of experience and knowledge does not give rise to sufficient exigent circumstances justifying the failure to obtain a warrant").

Furthermore, neither Trooper Proffitt nor Trooper Shelton believed at the time that a warrant was needed to obtain a blood sample from the defendant. Trooper Shelton stated that he believed the mandatory blood draw statute required the taking of the defendant's blood with or without a warrant. Sergeant Andes' testimony that he did not believe, in hindsight, that he would have had time to secure a warrant in this case was based upon his recollection that the defendant was "very critical" and that "once [the defendant] hit the ER if we weren't there waiting on him . . . there was no chance for us to get any blood." However, the record indicates that Sergeant Andes was told that the defendant was "very critical" and "it would be a miracle if he made it" shortly after his arrival at the scene. Yet, Sergeant Andes waited another 20 minutes to order Trooper Shelton to obtain a blood sample. Mere speculation of a defendant's need for surgery is insufficient to support a finding of exigent circumstances. *See State v. Micah Alexander Cates*, No. E2014-01322-CCA-R3-CD, slip op. at 13 (Tenn. Crim. App., Knoxville, Sept. 28, 2015) (A law enforcement officer's "concerns about surgery were based upon nothing more than mere speculation and were not supported by any specific and articulable facts. To support a finding of exigent circumstances, the Fourth Amendment demands more.") (citing *Meeks*, 262 S.W.3d at 723)) *rev'd on other grounds* No. E2014-01322-CCA-R3-CD, slip op. at 14 (Tenn. Crim. App., Knoxville, July 17, 2017).

Although Trooper Shelton observed the seriousness of the defendant's injuries and learned that the defendant would be taken into surgery, these circumstances do not justify an exigency because no attempt was made to secure a warrant prior to Trooper Shelton's learning of the defendant's imminent need for surgery. Officers cannot create an exigency by delaying a decision to seek a warrant.

The case of *Micah Alexander Cates* is quite similar to the present case. *Micah Alexander Cates* involved "a high impact collision," and when police officers arrived at the scene, they found Cates "lying in the roadway with an open fracture to his leg." *Micah Alexander Cates*, slip op. at 2. One officer testified that he was "concerned

---

the defendant's blood. During the suppression hearing, Trooper Proffitt and Sergeant Andes speculated as to the amount of time it would have taken them to secure a warrant based on the distance to the homes of two Carter County judges; they did not estimate the time to obtain a warrant from a Washington County judge.

not only with the injuries that we observed externally, but [also] the internal injuries that [Cates] could have." *Id.* (first alteration in original). That officer stated that, based on seeing Cates's injuries, he "knew that he was going to be going into surgery and [he] didn't want anything else to be put into his system prior to us drawing that blood." *Id.*, slip op. at 3. This court reversed the trial court's finding of exigent circumstances, stating that "these circumstances [were] not unique nor [did] they, without more, create exigent circumstances to justify the warrantless blood draw." *Id.*, slip op. at 13 ("There was no evidence in the record about the length of time it actually would have taken to obtain a warrant, and there was nothing to suggest that obtaining a warrant on this particular night would have taken longer than in other cases.").

The State argues that the THP officers here were "concerned that . . . [the defendant's] blood would be diluted by life-saving measures before the troopers could obtain a blood sample"; however, the State presented no proof either at the suppression hearing or the trial to support such a conclusion. First, the evidence clearly established that, like the officer in *McNeely*, the officers did not attempt to obtain a warrant because they "believed it was not legally necessary to obtain a warrant." *See McNeely*, 569 U.S. at 163. Indeed, as we have indicated, the officers waited more than 20 minutes after Sergeant Andes' arrival to order the blood draw and then waited another 17 minutes from the time Sergeant Andes gave the order for the blood draw and the time the defendant's blood was drawn. Moreover, the State adduced no proof that the officers knew, at the time of the blood draw, that a blood transfusion would be required or of the effect that drugs or a blood transfusion could have on the results of a blood test. Even if the State had shown the deleterious effects of the introduction of drugs or donated blood into the defendant's system, Sergeant Andes did not know that the defendant would need such procedures when he made the decision to have Trooper Shelton obtain a blood sample without a warrant. Sergeant Andes' speculation about treatment the defendant may have required is not sufficient to give rise to exigent circumstances. *See Micah Alexander Cates*, slip op. at 13.

This court has found exigent circumstances justifying a warrantless blood draw only twice since the *McNeely* decision. *See State v. Scarlet I. Martin*, No. M2016-00615-CCA-R3-CD, slip op. at 11-12 (Tenn. Crim. App., Nashville, Feb. 15, 2017) (finding exigent circumstances because a law enforcement officer worked a crash scene alone, had to remain at the scene for a tow truck to remove the vehicle, and did not develop probable cause until two hours after the crash); *State v. Darryl Alan Walker*, No. E2013-01914-CCA-R3-CD, slip op. at 6-7 (Tenn. Crim. App., Knoxville, May 20, 2014) (same). In both of these cases, there was no evidence of intoxication at the scene, and each officer had to wait for the defendant to complete a medical procedure before speaking with him or her at the hospital. *Scarlet I. Martin*, slip op. at 10-11; *Darryl Alan*

*Walker*, slip op. at 6-7. We have declined to apply the exigent circumstances exception post-*McNeely* in those cases where more than one officer was present at the scene and where a similar amount of time passed between the officers' developing probable cause and the blood draw. *See James K. Gardner*, slip op. at 11-12 (refusing to apply exigent circumstances exception when "[t]he blood draw occurred about forty-four minutes after the traffic stop began" and "[t]hree law enforcement officers were present at the scene"); *see also State v. Boyce Turner*, No. E2013-02304-CCA-R3-CD, slip op. at 10-11 (Tenn. Crim. App., Knoxville, Dec. 30, 2014) (refusing to apply exigent circumstances exception when there were "at least five Johnson City police officers that responded to the scene"); *State v. James Dean Wells*, No. M2013-01145-CCA-R9-CD, slip op. at 6-7 (Tenn. Crim. App., Nashville, Oct. 6, 2014) (upholding trial court's finding that no exigency existed when, among other things, "five officers were simultaneously investigating the incident"). In the present case, there were multiple officers working the crash investigation, and probable cause developed within minutes of Trooper Proffitt's arrival at the scene.

We hold that the evidence in the record preponderates against the trial court's finding of exigent circumstances, and such a finding was in error.

### III. Closing Argument

The defendant argues that the trial court erred by sustaining the State's objection raised during his closing argument. The defendant contends that he drew the jury's attention to the vehicle inspection report of the victim's Lexus "in an attempt to point out to the jury that the [victim's] rear lights were 'not in use' at the time of the accident and, therefore, the logical inference would be that the headlights were likewise off at the time of the collision." The State argues that, because the defendant did not question Officer Heatherly about his reporting the victim's rear lights as "not in use" on the vehicle inspection form, the defendant was arguing facts not in evidence.

Our supreme court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978). Accordingly, counsel for both the State and the defendant are generally permitted "wide latitude . . . in arguing their cases to the jury." *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994); *see also Terry*, 46 S.W.3d at 156. However, "[a]rgument must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999). "[T]he trial court has significant discretion in controlling these arguments," and this court will not overturn a trial court's decision absent "a

showing of an abuse of that discretion." *Terry*, 46 S.W.3d at 156 (citing *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975)).

In this case, the trial court sustained the State's objection because "[t]here was no testimony . . . from the Trooper about whether those lights were operable, but that the vehicle was damaged to the extent that it could not be evaluated." The record supports the trial court's ruling. The defendant did not question Officer Heatherly about why he marked the victim's rear lights as "not in use" but all other lights as "damaged/missing." He also did not ask Officer Heatherly to which specific lights "rear lights" referred. We hold that the trial court did not abuse its discretion by finding that the defendant's argument exceeded the permissible bounds of reasonable inferences.

## IV. *Sufficiency of the Evidence*

Finally, the defendant argues that the evidence adduced at trial was insufficient to sustain his conviction for vehicular homicide. The State asserts that "there was more than sufficient evidence to show that [the defendant's] intoxication and his driving on the wrong side of the road caused the victim's death." We agree with the State.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (superseded on other grounds); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As relevant to this case, Code section 39-13-213(a)(2) provides, "Vehicular homicide is the reckless killing of another by operation of an automobile . . . as the

proximate result of . . . [t]he driver's intoxication, as set forth in § 55-10-401." T.C.A. § 39-13-213(a)(2). Pursuant to Code section 55-10-401,

> It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state . . . while:
>
> (1) Under the influence of any intoxicant, marijuana, controlled substance, controlled substance analogue, drug, substance affecting the central nervous system, or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess; [or]
>
> (2) The alcohol concentration in the person's blood or breath is eight-hundredths of one percent (0.08%) or more . . . .

T.C.A. § 55-10-401(1)-(2). Furthermore, a blood alcohol concentration of .08 or more "shall create a presumption that the defendant's ability to drive was sufficiently impaired thereby to constitute a violation of § 55-10-401(1)." *Id.* § 55-10-411(a).

The State's evidence established that the defendant was driving his vehicle while his blood alcohol concentration was .247, which is three times more than the limit established by statute. *See id.* § 55-10-401(2). Doctor Ferslew testified that such a blood alcohol concentration "would have been sufficient to impair [the defendant's] ability, or psychomotor capabilities and contributed to his mis-operation of the vehicle." The evidence also showed that the defendant was driving in the wrong lane of traffic at the time of the accident and that he made no last-minute swerve, turn, or other maneuver into that lane; rather, his northbound vehicle was squarely in the southbound lane of traffic when the head-on collision occurred. There was no evidence of any mechanical failure of the defendant's vehicle. Several law enforcement officers testified that this crash was unusual in how the vehicles were perfectly aligned in a single lane of traffic. It was reasonable for a jury to conclude that the defendant was driving in the wrong lane of traffic because his level of intoxication impaired his ability to safely operate his vehicle. Accordingly, we hold that the evidence is sufficient to support the defendant's conviction of vehicular homicide by intoxication.

*Conclusion*

The trial court did not err by sustaining the State's objection during the defendant's closing argument. Furthermore, the evidence produced at trial was sufficient to support the jury's guilty verdict as to vehicular homicide by intoxication; however, the trial court erred by denying the defendant's motion to suppress the results of his warrantless blood draw. Accordingly, we reverse the judgment of the trial court, vacate the defendant's conviction, and remand for a new trial.

_____
JAMES CURWOOD WITT, JR., JUDGE